UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

KATHLEEN M. INZINCA,

                Plaintiff,      18-CV-6289

v.                                                 DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

## INTRODUCTION

Plaintiff Kathleen M. Inzinca brought this action pursuant to Title II and Title XVI of the Social Security Act (the "Act") seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). ECF No. 1. Presently before the Court are the parties' competing motions for judgment on the pleadings. ECF Nos. 11, 14. For the reasons that follow, Plaintiff's motion for judgment on the pleadings (ECF No. 11) is GRANTED, the Commissioner's motion (ECF No. 14) is DENIED, and the matter is REMANDED for further administrative proceedings.

## BACKGROUND

On November 25, 2014, Plaintiff filed applications for DIB and SSI alleging disability beginning on September 23, 2014. Administrative Record, ECF No. 9, ("Tr.") at 228-35. After both applications were denied, Plaintiff timely requested a hearing. Tr. at 137-38.

On March 20, 2017, Plaintiff appeared with her attorney, Justin Goldstein, Esq., and testified at a hearing before Administrative Law Judge, Kenneth Theurer ("the ALJ"). Tr. at 49-91. A Vocational Expert ("VE"), Linda Voss, also testified at the hearing. Tr. at 85-89. The ALJ issued

1

an unfavorable decision on April 14, 2017. Tr. at 15-25. Plaintiff then timely requested review by the Appeals Council, which the Council denied on February 12, 2018, making the ALJ's decision the final decision of the Commissioner. Tr. at 1-3. Plaintiff subsequently filed this lawsuit.

## LEGAL STANDARD

### I. District Court Review

The scope of this Court's review of the ALJ's decision denying benefits to Plaintiff is limited. It is not the function of the Court to determine *de novo* whether Plaintiff is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. *Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007), *cert. denied*, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault*, 683 F.3d at 447-48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

### II. Disability Determination

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial

2

gainful work activity. *See* 20 C.F.R. § 404.1520(b).[1] If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, *id.* § 404.1509, the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. *See id.* § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id.* § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national

---

[1] Because the DIB and SSI regulations mirror each other, the Court only cites the DIB regulations. *See Chico v. Schweiker*, 710 F.2d 947, 948 (2d Cir. 1983).

3

economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## DISCUSSION

### I. The ALJ's Decision

At step one of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of September 23, 2014. Tr. at 17. At step two, the ALJ found that Plaintiff suffered from several severe impairments: disorder of the lumbar spine, depression, and anxiety disorder. *Id.* The ALJ proceeded to the third step of the analysis and found that the severity of Plaintiff's impairments did not meet or equal the criteria of any listing. Tr. at 19. The ALJ then determined that Plaintiff retained the RFC to perform sedentary work with several limitations. *Id.* Specifically, he found that Plaintiff could occasionally lift ten pounds, sit for approximately four hours, stand for approximately two hours, and walk for approximately two hours in an eight-hour day with normal breaks. He also determined that Plaintiff could alternate from a seated to a standing position three times per hour for not more than five minutes at a time while remaining on task. She could also climb ramps or stairs, but could never climb ladders, ropes, of scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl. The ALJ further determined that Plaintiff's work would be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, and would involve only simple, work-related decisions with few, if any, workplace changes. *Id.*

At step four, the ALJ found that Plaintiff was not capable of performing her past relevant work. Tr. at 23. The ALJ then proceeded to step five, where he determined that there were jobs in the national economy that a person of Plaintiff's age, education and work experience could

perform. Tr. at 24. Specifically, the ALJ found that Plaintiff could work as a document preparer, call-out operator, and addresser. *Id.* accordingly, the ALJ concluded that Plaintiff was not disabled.

## II. Analysis

Plaintiff argues that the ALJ's RFC is not supported by substantial evidence because the ALJ failed find her cervicalgia (neck pain) and thoracic disorder severe in step two of the analysis, failed to properly evaluate the opinion of Plaintiff's treating physician, Dr. Laura Booth, M.D., and, lastly, to properly evaluate her credibility when he formed Plaintiff's RFC. ECF No. 11-1. For the reasons stated below, the Court agrees with Plaintiff's argument that the ALJ erred in step two of the analysis, and, as such, will not address Plaintiff's remaining arguments.

### A. Step Two Analysis

In step two of the sequential analysis, the ALJ is required to determine whether an impairment or combination of impairments that has lasted or is expected to last for a continuous period of at least 12 months limits claimant's physical or mental ability to perform basic work activities. 20 C.R.F. §§ 404.1509, 404.1520(c). The regulations define "basic work activities" as "the abilities and aptitudes necessary to do most jobs," including "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "[c]apacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1522(b).

Although Plaintiff bears the burden of proof at step two, it is not a heavy burden. The Second Circuit has long held that "the standard for a finding of severity under Step Two of the sequential analysis is *de minimis* and is intended only to screen out the very weakest cases."

*McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)). However, despite this lenient standard, the "'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'" *Taylor v. Astrue*, 32 F. Supp. 3d 253, 266 (N.D.N.Y. 2012) (internal citation omitted). Where a claimant produces some evidence of an impairment, the Commissioner may make a determination of non-disability at step two only when the medical evidence "establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856, at *3 (1985). Such determination is made after the ALJ carefully evaluates the medical findings that describe the impairment and by making "an informed judgment about its limiting effects on the individual's physical . . . ability to perform basic work activities[.]" *Id.* at *4.

Here, the ALJ determined that Plaintiff's cervical and thoracic disorders were non-severe because diagnostic images of Plaintiff's cervical and thoracic spine showed minor abnormal findings, and because treatment notes of Dr. Booth, Plaintiff's primary treating physician, indicated that both impairments were controlled. Tr. at 18. The Court disagrees with the ALJ's reasoning for several reasons.

First, the record is replete with medical evidence demonstrating Plaintiff's continuous struggle with back pain. While a significant portion of the record relates to Plaintiff's low back impairment,[2] it also contains substantial evidence from which the ALJ should have determined

---

[2] Plaintiff's lumbar impairment appears to be rooted in an annular tear within L5-S1 disc and foraminal stenosis, both of which were identified through MRI testing performed in September 2014. Foraminal stenosis is a type of spinal stenosis that "refers to compression of a spinal nerve as it leaves the spinal canal through the foramen (the opening between the vertebrae through which spinal nerve roots travel and exit to other parts of the body)." Neural Foraminal Stenosis Definition, https://www.spine-health.com/glossary/neural-foraminal-stenosis (last visited February 26, 2020).

that Plaintiff had been suffering from cervicalgia and thoracic impairments, both of which were more than a "slight abnormality." The same MRI examination report that the ALJ relied upon to conclude that Plaintiff's cervical and thoracic disorders were not severe revealed that, while Plaintiff had an annular tear in her lumbar area, her cervical and thoracic spine also showed mild degenerative changes.[3] Tr. at 319-21. Degenerative changes, regardless of how mild or moderate they might be, can hardly be considered insignificant. *Ross v. Colvin*, No. 6:16-cv-06618(MAT), 2018 WL 947267, at *4 (W.D.N.Y. Feb. 20, 2018) (Plaintiff's elbows had a congenial abnormality because of mild degenerative changes that were confirmed by radiographic studies).

Both treatment records and Plaintiff's hearing testimony pay tribute to the severity of Plaintiff's cervicalgia and thoracic impairments, and demonstrate that her basic work activities were substantially compromised due to pain associated with both impairments. In fact, the record demonstrates that Plaintiff twice quit her job because of severe neck and upper back pain. Tr. at 339, 344, 348. Even though she wanted to work, she could not do so because of her back pain. Tr. at. 344, 440.

Additionally, Plaintiff's cervical and thoracic impairments were continuously noted by each medical provider who supplied an opinion regarding Plaintiff's physical impairments. Dr. Booth noted Plaintiff's cervicalgia in 2012, well before the alleged onset date, and indicated that it was an ongoing issue for Plaintiff then. Tr. at 329. Subsequently, she and her physician assistant, Jerry Desimone, continuously noted Plaintiff's complaints of severe cervical and thoracic pain, which were separate from her complaints of lumbar pain, and Plaintiff was regularly prescribed medication to treat such pain. Tr. at 329, 332, 337, 339, 341, 344, 346, 350, 438-40, 476. In her

---

[3] Cervical degenerative disc disease occurs when one of more of the cushioning discs in the cervical spine starts to break down. Cervical Degenerative Disk Disease, https://www.spine-health.com/conditions/degenerative-disc-disease/cervical-degenerative-disc-disease (last visited February 26, 2020).

medical source statement, Dr. Booth identified Plaintiff's thoracic back pain as the reason why Plaintiff could not engage in full-time competitive employment. Tr. at 492. Examination notes of Dr. Booth, as well as Garrett Morris, M.D., and consultative examiner Harbiner Toor, M.D., revealed that during Plaintiff's examination she often visibly appeared to be in moderate pain, had difficulty with sit to stand transition, used her hands on armrest for assistance, had difficulty getting on and off exam table, and moved deliberately around the examination room. Tr. at 340, 344, 346, 348, 375, 438, 469, 480-81. Their treatment records also demonstrated that Plaintiff's neck and thoracic back were tender, she had limited range of motion of her neck when twisting made it painful, could not turn her head too far because of pain, and was in pain "all the time most of the time" because of neck pain. *Id.* Plaintiff often reported her pain level to be 10/10 on the scale from 1 to 10, and identified her neck pain as the reason for insomnia. Tr. at 344.

In support of his argument that Plaintiff's cervicalgia and thoracic impairments were not severe the Commissioner relies on Plaintiff's lack of significant treatment and on recommendations of some of Plaintiff's treating physicians who had prescribed conservative treatment measures to relieve her back pain. ECF No. 14-1, at 18-19. This argument is not persuasive. It is true that Dr. Petraglia, did not recommend that Plaintiff undergo neurosurgical intervention, and instead suggested that Plaintiff continue to pursue conservative pain management options. Tr. at 324. However, the record demonstrates that such options were not effective. In fact, over the years, Plaintiff's treatment of her neck and mid-back pain included TENS units, physical therapy, heating pads, Lidoderm patches, steroid injections, and narcotics such as Vicodin[4] and Hydrocodone, which she took multiple times per day. However, except for the

---

[4] Vicodin is a combination of medication consisting of an opioid pain reliever, hydrocodone, and non-opioid pain reliever, acetaminophen, used to relieve moderate to severe pain. Drugs & Medications, https://www.webmd.com/drugs/2/drug-3459/vicodin-oral/details (last visited February 26, 2020).

narcotics, neither of these measures were effective, and at times made her pain worse. Tr. at 344, 438, 440. Even though Dr. Booth often noted that Plaintiff's pain was "controlled," it is apparent that Plaintiff had to heavily rely on Vicodin and later Hydrocodone as the only available to her pain management option that only temporarily reduced her pain. Tr. at 63-64, 332, 346, 350, 373, 399, 443. Notably, both medications made her feel fatigued and concerned about whether it was safe to take that many opioids each day because at that time she was taking six Hydrocodone pills per day. Tr. at 346, 492. *See Fuller v. Astrue*, No. 09-Ccv-6279, 2010 WL 5072112, at *7 (W.D.N.Y. Dec. 6, 2010) (the ALJ failed to recognize Plaintiff's depression as severe impairment because Plaintiff's treating sources repeatedly recognized depression and prescribed medications to treat it even though she received limited relief from them); *but see Windom v. Berryhill*, No. 6:17-cv-06720-MAT, 2018 WL 4960491, at *3 (W.D.N.Y. Oct. 14, 2018) (the ALJ found Plaintiff's physical conditions were non-severe because they were either controlled, minimally treated, anomalously episodic, or lacking in specific complaints to support a findings that it caused more than minimal limitations to perform work activities).

Plaintiff testified that her primary impairments were neck, middle back, and lower back pain. Tr. at. 69. Even though she had a driver's license, Plaintiff could not drive longer than twenty minutes because of the pain she felt in her neck from turning her head sideways when driving. Tr. at 70-71. The only time her neck did not hurt was when she looked straight ahead. All her other neck movements, such as turning her head sideways or looking up and down, caused Plaintiff to experience significant pain. Tr. at 71-72. She spent most of her days sitting on a couch watching TV because that was the only position she found to be tolerable. Tr. at 70. Even though Plaintiff could shop, she only did that in smaller stores because walking through a smaller store did not aggravate her back pain. Tr. at 66-67. Plaintiff testified that she could no longer clean or

wash dishes because standing caused pain in her mid-back. Tr. at 69. She cooked and did laundry only once week, and even though she could shower, dress and bathes, she could not wipe without pain. Tr. at 344, 440, 481.

The Commissioner argues that even if the ALJ erred in determining the severity of Plaintiff's cervical and thoracic spine, such error was harmless. The Court disagrees.

As a general matter, step two error can be found harmless when an ALJ considers both severe and non-severe impairments in the subsequent steps of the sequential analysis. "Because Step Two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 593 (S.D.N.Y. 2014). Courts in the Circuit have determined that an error in failing to identify all severe impairments in step two is harmless "when an administrative law judge identifies some severe impairments at Step 2, and then proceeds through [the] sequential evaluation on the basis of [the] combined effects of all impairments, including those erroneously found to be non severe . . . ." *Snyder v. Colvin*, No. 5:13-CV-585 GLS/ESH, 2014 WL 3107962, at *5 (N.D.N.Y. July 8, 2014); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (summary order) (even though the ALJ did not consider anxiety and panic disorders in step two analysis, the error was harmless because he specifically considered them at the remaining steps of the sequential analysis). "Specifically, when functional effects of impairments erroneously determined to be non-severe at Step 2 are, nonetheless, fully considered and factored into subsequent residual functional capacity assessments, a reviewing court can confidently conclude that the same result would have been reached absent the error." *Snyder*, 2014 WL 3107962 at *5.

Here, the ALJ has failed to consider the effects of Plaintiff's cervical and thoracic impairments following step two of his analysis. On the contrary, the ALJ specifically pointed to Plaintiff's failure to establish the severity of her cervical and thoracic impairment when he discussed her subjective complaints in relation to the lumbar impairment, and proceeded to solely address Plaintiff's lower back disorder in his analysis. Tr. at 22. Even though some of the medical records that ALJ relied on to discredit Plaintiff's subjective complaints contained references to her neck and mid-back, the ALJ's analysis, however, was silent as to both of these impairments. Because disorder of the lumbar spine is different from cervical and thoracic disorders, it presumably could produce a different set of limitations as to one's ability to do basic work activities, which, as a result, could alter the exiting RFC. Therefore, remand is necessary so that the ALJ can consider Plaintiff's cervicalgia and thoracic impairments in his step two analysis.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (ECF No. 11) is hereby GRANTED, and the Commissioner's motion for judgment on the pleadings (ECF No. 14) is DENIED. This case is hereby REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk of Court is directed to enter judgment and close the case.

**IT IS SO ORDERED.**

Dated: March 4, 2020
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court